## TIMETRUST, Inc., et al. v. SECURITIES AND EXCHANGE COMMISSION.

### No. 9823.

Circuit Court of Appeals, Ninth Circuit.

July 31, 1942.

Keyes & Erskine and Louis Ferrari, all of San Francisco, Cal., for appellant Bank of America and another.

Dreher, McClellan & McCarthy, of San Francisco, Cal., for appellant A. P. Giannini.

John L. McNab, of San Francisco, Cal., for appellant J. M. Grant.

Bacigalupi, Elkus & Salinger and Claude N. Rosenberg, all of San Francisco, Cal., and Gumpert & Mazzera and Harry A. Mazzera, all of Stockton, Cal., for appellants Timetrust, Inc., et al.

Chester T. Lane, Gen. Counsel, C. Christopher M. Jenks, Asst. Gen. Counsel, and J. Leonard Townsend, Sp. Counsel, all of Philadelphia, Pa. (Douglas M. Orr

and H. Gardner Putnam, both of Philadelphia, Pa., of counsel), for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

This action was brought by the Securities and Exchange Commission, a federal agency, to obtain an injunction prohibiting the appellants from continuing operating a plan denounced by the complaint as a "device, scheme or artifice to defraud", for the purpose of selling the capital stock of the appellant bank. Briefly stated, the plan permitted the purchase of such stock by pooling the monthly payments of the various purchasers, and the purchase on the market of such stock at market price, the payments to be made by a trustee, the Title Guarantee and Trust Company, the stock to be allotted pro rata to the various purchasers, title to be taken in the name of the trustee. The appellant Timetrust, Inc., was organized to promote the purchase of such bank stock. It employed a large number of salesmen to sell the plan to the prospective purchasers, issuing a certificate to the purchaser when the transaction was completed. Such certificate and passbook, or receipt book, showing monthly payments constituted the sole evidence of title in the hands of the purchasers.

The commission does not claim that the plan is inherently wrong or illegal, but that the literature issued by Timetrust, Inc., was so formulated that it lent itself to the actual misrepresentations made verbally by the salesmen.

In considering the relationship of the various parties defendant, it should be noted that this was not a scheme to promote a new and valueless stock by a promotion plan including the incorporation of the new company. In such a case it would be readily seen that all the persons engaging in the fraud would be equally responsible. Here the plan dealt with the stock of a long established bank with assets of over $2,000,000,000, and involved several corporations already incorporated and established. It is not claimed by the Commission that the stock was sold for more than it was intrinsically worth or for more than its market price. The Commission claims that the plan, although legal and honest on its face, was so set up and operated that the purchasers were in fact misled and defrauded and that this fraud was intended by those who participated in the plan. The

defendants have appeared in two separate groups with different attorneys. One group, referred to as the main or principal defendants, consists of the new corporation Timetrust, Inc., and its officers, Meredith Parker, Ralph W. Wood and H. E. Blanchett, who actively controlled the salesmen and the operation of the plan. The other group, referred to in the briefs as aiders and abettors, consisted of the Bank of America Trust and Savings Association, and its president, L. Mario Giannini, and A. P. Giannini, who is Chairman of the Board of Directors of the bank.

Until July 15, 1937, 99.36% of the bank stock was owned by a corporation known as Transamerica. A. P. Giannini was Chairman of the Board of Directors of Transamerica, and his son L. Mario Giannini, was a member of its Board of Directors. Appellant John Grant, now deceased, was the President of Transamerica at the time of the transactions involved herein. This group of defendants and appellants claim that the plan approved by them was perfectly honest and that they cannot justly be charged with wrong because fraud crept into the operation of the plan by reason of the misconduct of salesmen employed by Timetrust, Inc. The officers of Timetrust, Inc., claim that all fraudulent practices of the salesmen were without authority and although no doubt conceding that they were civilly responsible for any misrepresentations of their agents they cannot justly be restrained from operating the plan in a legal and honest manner as it was intended by them to do.

It is evident that those concerned with the plan might well consist of those who honestly approved an honest plan and those who took advantage of the plan to commit fraud in its operation.

With this explanation it will clarify the situation to state the findings of the trial court which are as follows:

"1. The defendants A. P. Giannini, L. Mario Giannini, John M. Grant, Meredith Parker, Ralph W. Wood and H. E. Blanchett collaborated in the organization of the defendant corporation Timetrust, Incorporated, and in the formulation of the plan of its activities and its operations.

"2. The defendant Timetrust, Incorporated, was organized for the purpose of distributing to permanent investors stock of the defendant Bank of America National Trust & Savings Association, owned by the Transamerica Corporation, which was un-

der the management of the defendants A. P. Giannini, L. Mario Giannini and John M. Grant.

"3. The distribution of the stock of the defendant Bank of America National Trust & Savings Association was effected by the remaining defendants through the medium of selling Timetrust certificates on installment payments; when received by the defendant Timetrust, Incorporated, such payments, after the deduction of certain charges and fees, were used for the purchase of stock of said Bank of America National Trust & Savings Association, at the market price then prevailing, and the account of each certificate purchaser making a payment credited with his proportionate share in the stock so purchased.

"4. Without so disclosing to the purchasers of Timetrust certificates, the defendants, through their activities in the market, stabilized the market price of stock of said Bank of America National Trust & Savings Association purchased by Timetrust, Incorporated, for the accounts of investors in its certificates.

"5. The defendant Bank of America National Trust & Savings Association afforded its facilities to its co-defendants in effecting sales of certificates of Timetrust, Incorporated, and in collecting the payments therefor; it distributed literature of Timetrust, Incorporated, and counselled with its salesmen and prospective purchasers of its certificates.

"6. The United States mails were used by the defendants in promoting and effecting sales of certificates of the defendant Timetrust, Incorporated.

"7. Untrue statements of material facts and omission to state material facts necessary to be stated in order to make statements made in the light of the circumstances under which they were made not misleading, as alleged in sub-paragraphs (a) to (c) inclusive, and (e) to (o) inclusive of Paragraph VIII of plaintiff's complaint, were made to prospective purchasers by salesmen of the defendant Timetrust, Incorporated, to induce the purchase of said certificates.

"8. After a prospective purchaser had made his first payment with his application to purchase a Timetrust certificate, he was furnished with a written certificate issued by Timetrust, Incorporated, which together with the 'Agreement of Trust' expressly made a part thereof, fully and correctly described the investment plan of the defendant Timetrust, Incorporated.

"The defendants have sought to absolve themselves of any vice in the method of selling Timetrust certificates by disavowing and disclaiming any responsibility for the untrue statements alleged to have been made to prospective purchasers, contending that the entire transaction is contained in the written certificate and agreement of trust. The Court holds that the purpose of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., may not be so defeated. From the facts found by the Court, it holds that the conduct of the defendants is contrary to the Securities Act of 1933.

"It is therefore ordered, that the defendants be and they are hereby enjoined as prayed in the complaint." [1]

These representations shown in footnote are that the Timetrust certificates are (a) similar to savings bank account but pay a

---

[1] (a) That the purchase of a Timetrust Certificate is the same as, or similar to, the creation of a savings account in a bank, and that such Certificates will pay a higher rate of return than can be obtained from a savings bank account; whereas, in truth and in fact, the purchase of a Timetrust Certificate is not the same as or similar to the creation of a savings account in a bank and the Timetrust plan is essentially a plan for indirect speculation in the common stock of Bank of America National Trust & Savings Association, and the value of a Timetrust Certificate is at all times dependent upon the market price of said Bank stock, and there is no fixed rate of return on said Bank stock, thereby making it impossible to predict with accuracy that the rate of return will be better or worse than the fixed rate of return of a savings bank account, which facts defendants omitted to state and which facts were necessary to be stated in order to make the statements made not misleading.

(b) That the money paid in by purchasers of said Certificates would be available at all times, and might be withdrawn in full at any time or subject only to a small, insignificant, or nominal fee, or a revocation fee of $2.50; whereas, in truth and in fact, the money paid in by purchasers of said Certificates would not be available at all times, nor could it be withdrawn in full at any time subject only to a small, insignificant, or nominal, or a revocation fee of $2.50. There is no provision in the Timetrust plan for "withdrawing" money paid in, as that

higher rate of interest; (b) that money paid in would be available at all times, subject to a small fee; (c) that the plan was one for the accumulation of a definite sum; (d) * * *; (e) that the system provided for dollar averaging, a new and unique plan; (f) that the system of dollar averaging made certain a profit of from $50

term is popularly understood and was and is understood by prospective purchasers. Purchasers seeking return of monies paid in on a Timetrust Certificate must "revoke the trust" and pay a fee therefor of $2.50. Upon revocation, the purchaser of a Timetrust Certificate obtains cash for all fractional shares and obtains all full shares of Bank stock which have been purchased with the balance of monies paid into his account, remaining after deduction of heavy and substantial fees and charges as heretofore set forth in Paragraph IV. None of the fees and charges which have previously been deducted from the monthly payments made by the trustor are re-credited to his account, or returned to him in the event of revocation. The value of all shares of Bank stock obtained upon revocation is dependent upon the then market price of such shares, and it is impossible to determine in advance what amount, if any, will be available to or may be realized by a "trustor" upon revocation. As of February 27, 1939, the market value of Bank stock purchased by the trustee for the account of all "trustors" was approximately 40.39% less than the amount of payments made by "trustors" as of that date.

(c) That the purchase of a Timetrust Certificate and the making of monthly payments thereunder represent a safe, sound, and secure method of accumulating a definite sum for some contemplated future need or purpose, such as old age retirement fund, an emergency fund, a children's educational fund, a vacation fund, or a business "reserve" for depreciation, obsolescence, and similar purposes; whereas, in truth and in fact, the purchase of a Timetrust Certificate and the making of monthly payments do not represent a safe, or a sound, or a secure method of accumulating a definite sum for some contemplated future need or purpose, such as an old age retirement fund, an emergency fund, a children's educational fund, a vacation fund, or a business "reserve," in that the Timetrust plan is merely a plan indirectly to acquire Bank stock, the value of which fluctuates with the rise and fall of the market price thereof.

* * * * * *

(e) That the principle of dollar averaging is unique and original and is available to a small investor only through the Timetrust plan, and that by applying the principle of dollar averaging under the

Timetrust plan an investor would solve the "age-old problem" of "when to buy" and "when to sell," meaning thereby and intending to convey and conveying the meaning to prospective purchasers that the principle of dollar averaging would solve the problems of "when to buy" and "when to sell" wisely and profitably, and that the employment of the principle of dollar averaging under the Timetrust plan would assure to a purchaser of a Timetrust Certificate a profit under any and all stock market conditions unless the Bank of America National Trust & Savings Association failed; whereas, in truth and in fact, the principle of dollar averaging is not unique or original, nor is it available to a small investor only through the Timetrust plan, nor by applying the principle of dollar averaging under the Timetrust plan could an investor solve the problem of "when to buy" or "when to sell" wisely or profitably, nor would employment of the principle of dollar averaging under the Timetrust plan assure to a purchaser of a Timetrust Certificate a profit under any and all stock market conditions, unless the Bank of America National Trust & Savings Association failed. The principle of dollar averaging in fact has been well known for many years, and has been and is now available to small investors in a large number of so-called "thrift plan" companies.

(f) That through the operation of the principle of dollar averaging and "compounding" under the Timetrust plan, a Timetrust Certificate, at or before maturity thereof, will be worth variously stated amounts, ranging from 50% to 300% in excess of the face amount of the certificate; whereas, in truth and in fact, there was, and is, no reasonable basis upon which the future worth of a Timetrust Certificate could have been or can be so predicated, as the worth thereof is solely and entirely dependent upon the fluctuating market price of shares of Bank stock which have been purchased for the account of the "trustor" with the balance of his monthly payments, remaining after the deduction of designated fees and charges, as hereinbefore set forth in Paragraph IV, which market price of said shares may well be substantially less than the amount of payments made by a "trustor."

(g) That through the operation of the principle of dollar averaging under the Timetrust plan, the "trustor" is enabled

to $300; (g) that it was not stated that dollar averaging only operates when a fixed sum is paid regularly; (h) that Timetrust is free from human errors; (i) that compound interest or dividends would be paid in addition to the principal; (j) that Timetrust provides for dividend accumulation or compounding; (k) that the purchaser

to acquire shares of Bank stock at an average cost which is less than the average market price of such shares, omitting to state the material facts necessary to be stated in order to make the statements made not misleading, that the operation of the principle of dollar averaging under the Timetrust plan is dependent upon the making of equal payments of a fixed amount at stated intervals, and that the principle of dollar averaging will operate only if the "trustor" is able to and will make his payments at regular intervals for a stated period, irrespective of whether business, market, or personal conditions are favorable or adverse during that period.

(h) That the operation of the Timetrust plan is free from all risks and/or errors arising from the exercise of human judgment; whereas, in truth and in fact, the operation of the Timetrust plan is not free from all risks or errors arising from the exercise of human judgment, and is subject to the same risks and errors as are involved in any common stock investment, and at the end of the ten year period contemplated by such plan, Timetrust Certificate holders receive Bank stock and occupy the same position and are confronted with the same problems as the average purchaser of common stock.

(i) That the Timetrust plan provides for compounding income by reinvestment of dividends received on shares and fractions of shares of Bank stock purchased by the trustee for the account of the "trustor," meaning thereby, and intending to convey and conveying the meaning to prospective purchasers that the principal sums paid in by the "trustor" would at all times remain safe and intact and would be increased and augmented by the receipt and reinvestment of such dividends; whereas, in truth and in fact, the Timetrust plan does not provide for compounding income in such a way that the principal sums paid in would at all times remain safe or intact or that such principal sums would be increased or augmented by the receipt and reinvestment of such dividends, since the value of a Timetrust Certificate is at all times dependent upon the fluctuating market price of shares of Bank stock purchased by the Trustee for the "trustor's" account with the balance of monthly payments remaining after the deduction of substantial fees, as hereinbefore set forth in Paragraph IV.

(j) That the Timetrust plan provides for "compounding appreciation" in the market price of shares of Bank stock purchased by the trustee for the account of the "trustor"; whereas, in truth and in fact, the Timetrust plan does not, and could not, provide for "compounding appreciation" in value of bank shares purchased by the trustee for the account of the "trustor," since there is no way under the Timetrust plan by which appreciation, if any, may be compounded.

(k) That a purchaser of a Timetrust Certificate could expect a combined return from income from and appreciation in the shares of Bank stock purchased by the trustee for the account of the "trustor" of from 7% to 15% per annum, and that such combined return of from 7% to 15% per annum compounded on an investment of $50 per month over a ten year period on a Timetrust Certificate in the face amount of $6,000, would give to such Certificate at the expiration of ten years a value of from $8,685 to $13,778; whereas, in truth and in fact, there was and is no sound basis upon which a return of 7% to 15% per annum on shares of Bank stock could have been made, or can be, predicated, and there was and is no sound basis upon which to predicate the statement that a combined return from income and appreciation of from 7% to 15% per annum, compounded on an investment of $50 per month over a ten year period on a Timetrust Certificate in the face amount of $6,000, would give to such Certificate at the expiration of ten years a value of from $8,685 to $13,778, for the reason that the estimation of such values failed to take into consideration the possibility that there may be no earnings in any particular year, and the stock may actually depreciate rather than appreciate in value, and for the further reason, among others, that the worth of a Timetrust Certificate after monthly payments are made thereunder for ten years will entirely depend upon the unpredictable market price at that time of shares of bank stock purchased by the trustee for the "trustor's" account with the balance of monthly payments remaining after the deduction of substantial fees, as hereinbefore set forth in Paragraph IV. Furthermore, in representing to prospective purchasers that an investment in a Timetrust Certificate of $50 per month for a period of ten years, at a compound-

would receive from 7 to 15% per annum income and appreciation which compounded would give for a $50 monthly payment for ten years ($6,000) a value of from $8,685 to $13,778; (1) that the insurance feature of the plan assured the beneficiary for the full amount of his certificate payable in cash; (m) that monthly payments would be invested in bank stock without substantial reduction whereas a large per cent was deducted from the first 18 months' payments; (n) that the purpose of the choice of the bank stock was because it was a fine investment, whereas it was selected to effect a distribution of the bank's stock; (o) that the purpose was to help provident minded people to secure the better things of life, whereas its purpose was to effect a wide distribution of the bank stock.

None of these representations were made in the printed prospectus nor in the written application signed by the purchaser, nor in the certificate or trust agreement mailed to him immediately after his application and first payment were made. These documents contained explicit statements as to the method through which the bank stock was to be purchased and held and the amount of the creation fee and the method and cost of revocation.

 The appellee being dissatisfied with the findings which, as we have seen, did not find that there was a scheme, artifice or device to defraud, moved the court to make a specific finding to that effect and also moved for an amended conclusion of law to that effect. The court denied the application for the finding of fact but granted the application for the amended

---

ed return of from 7% to 15% per annum, would give a value to such Certificate, at the expiration of ten years, of $8,685 to $13,778, defendants, and each of them, and their officers, agents, and sales personnel, omitted to state the material fact necessary in order to make the statements made not misleading, that the estimation of such values failed to take into account the effect of the deduction of substantial fees and charges payable under the Timetrust plan prior to the investment of such monthly payments, as hereinbefore set forth in Paragraph IV.

(l) That where insurance is taken out with a Timetrust Certificate, the life of the "trustor" is insured for the full face amount of the Certificate, so that in the event of his death while his Timetrust Certificate is in effect, there would immediately be paid to his designated beneficiary a lump cash sum consisting of the face amount of his Certificate; whereas, in truth and in fact, the insurance protection is not in the amount of the face amount of the Certificate, but in the amount of the payments remaining unpaid on the Timetrust Certificate.

(m) That all monthly payments made under a Timetrust Certificate would be kept intact, or that all such monthly payments would be invested in shares of Bank stock, or that only a small, or insignificant, or nominal fee would be deducted from the monthly payments, or that the only fees and charges that would be deducted from the monthly payments would be trustee's fees of 30¢ per month and/or insurance premiums and/or a revocation fee of $2.50 payable upon revocation of a "timetrust"; whereas, in truth and in fact, a creation fee in the

sum of 6% of the first $1,200 face amount, in the sum of 5¼% of the next $1,800 face amount, in the sum of 4¾% of the next $3,000 face amount, in the sum of 4¼% of the next $6,000 face amount, and in the sum of 3½% on all amounts in excess of $12,000, of any Timetrust Certificate or Certificates would be deducted from payments equalling the sum of the first eighteen regular monthly payments, and would be $72, or 40% of such sum on a $1,200 face amount Certificate, and would increase in amount but would decrease in percentage to the face amount of the Certificate with the increase of such face amount, and would be $954, or approximately 26%, of payments equalling the sum of the first eighteen regular monthly payments on a $24,000 face amount Certificate.

(n) That stock of Bank of America National Trust & Savings Association was chosen as the investment medium for Timetrust, Incorporated, because it was the finest investment medium available; whereas, in truth and in fact, stock of Bank of America National Trust & Savings Association was not chosen as the investment medium for Timetrust, Incorporated because it was the finest investment medium available, but was chosen in order to effect the purposes hereinabove recited in Paragraph VI.

(o) That the purpose of Timetrust, Incorporated is to enable provident-minded persons to secure the better things in life, whereas, in truth and in fact, the purpose of Timetrust, Incorporated was and is to carry out the distribution program hereinabove referred to in Paragraph VI.

conclusion of law. This gives rise to a curious situation. The appellee contends that the conclusion of law is in fact a finding of an ultimate fact; that is, a finding that there was in fact a device, scheme or artifice to defraud. This contention is amply supported by the authorities. Bogan v. Hynes et al., 9 Cir., 65 F.2d 524. The difficulty here arises from the fact that the court declined to find as a fact that there was a fraudulent scheme covering the operations of all the defendants but incorporated that idea into a conclusion of law. The court may have been of opinion that the actual fraud of the salesmen was imputed as a matter of law not only to their immediate employers but also to those who devised the general plan of selling stock and hence that as the plan as actually operated was fraudulent it must as a matter of law be held to be a fraudulent plan. It should be observed that the findings for or against fraud were of the utmost importance to the defendants. The decree merely enjoins the parties from making fraudulent representations in the sale of bank stock and other securities. As such representations are denounced by the criminal law, no one could or would protest against such an injunction which merely prohibits them from committing crime. The sting of the decree lies in the implication that the defendants are dishonest. It is asserted that the mere institution of these proceedings caused a depreciation in the value of the bank stock of over one hundred million dollars and has practically stopped the sale of stock by Timetrust, Inc. It should be observed that the actual perpetrators of the fraud, the forty or fifty salesmen, are not parties here, and that the question is as to whether or not the defendants launched a fraudulent scheme. We are of the opinion that the case should be remanded to the trial court for a specific finding of fact as to whether or not the defendants, or any of them, devised a fraudulent scheme such as is denounced by the statute. We are not suggesting by the above recital that the district judge reached his conclusion of law that the fraud had been committed without an appreciation of all that we have here stated.

 In view of our conclusion we have refrained from commenting upon the voluminous record of over 5,000 pages and a discussion of the points raised in the briefs, further than to hold that there is conflicting evidence on the issue of fact, upon which the required finding is to be made, from which the court may draw inferences for or against a finding of the fraud which the district judge has stated as a conclusion of law. The responsibility for a decision on the facts lies with the trial court and we do not wish to in any wise interfere with such decision.

The case is remanded to the United States District Court for the Northern District of California, to Judge Sames of the United States District Court of Arizona, presiding therein. The findings made will be returned to this court as a part of the record on appeal.

 The defendant, John M. Grant, having died during the pendency of this appeal the case is dismissed as to him.